UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA  :

                         :

  - v -                  :

                         :         **03 Cr. 1120 (FB)**

**EDWARD COPELAND,**      :
      Movant-Defendant.    :
- - - - - - - - - - - - - - - - - - - - - - - - - x


### EMERGENCY MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Federal Defenders of New York
Daniel Habib, Esq.
Attorney for Movant-Defendant
**Edward Copeland**
52 Duane Street—10th Floor
New York, NY 10007
Tel.: (646) 484–1724

TO:       RICHARD P. DONOGHUE, ESQ.
              United States Attorney
              Eastern District of New York
              271 Cadman Plaza East
              Brooklyn, NY 11201
Attn:     **J. Matthew Haggans, Esq.**
              Assistant United States Attorney

Edward Copeland is 67 years old. He suffers from hypertension, aortic atherosclerotic disease, chronic hepatitis C, latent tuberculosis infection, pre-diabetes, hyperlipidemia, and vitamin D deficiency. His age and underlying medical conditions put him at high risk for severe illness and death from COVID–19. And he is incarcerated at FCI Fort Dix, where 29 inmates and two staff members have tested positive for the novel coronavirus.

Copeland has served about 19 years of a 23-year sentence for driving the getaway car during a bank robbery in which $3,710 was stolen and no one was injured. While imprisoned, Copeland has incurred no disciplinary infractions. He has been promoted several times on his work detail, and is now a building coordinator responsible for training new orderlies. He has completed drug treatment, and has participated in, designed, and taught dozens of other rehabilitative, vocational, and educational programs. Copeland's counselor, who has supervised him for the past six-plus years, writes: "Inmate Copeland is a leader in his religious community. Every staff member at the institution has had a positive interaction with inmate Copeland. Inmate Copeland has demonstrated tremendous growth as a worker and a human being."

"Extraordinary and compelling reasons" exist to warrant Copeland's immediate compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). First, Copeland's age and serious medical conditions, coupled with the emergence and rapid spread of COVID–19 at Fort Dix, "substantially diminish[]" his "ability to provide self-care"—to practice self-isolation, social distancing, sanitation, and proper hygiene, as necessary to protect himself from infection—"within the environment of a correctional facility." U.S.S.G. § 1B1.13 cmt. n.1(A)(ii). Second, apart from the pandemic, Copeland is at least 65 years old, "is experiencing a serious deterioration in physical or mental health because of the aging process," and has served at least 10 years of his sentence. § 1B1.13 cmt. n.1(B). Third, apart from both the pandemic and his

1

declining health, Copeland is at least 65 years old and has served at least 75 percent of his

sentence. *See* §1B1.13 cmt. n.1(D); BOP, Program Statement 5050.50, Compassionate

Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and

4205(g), at § 4(c) (Jan. 17, 2019), *available at* https://bit.ly/2S4QmOw (this, and all websites

cited herein, last visited Apr. 25, 2020). Each of these three sets of circumstances suffices to

justify the release of this elderly, infirm, and changed man who has served a substantial sentence

of about 229 months. Together, they compel that course, in particular once this Court exercises its

independent authority to determine what constitute "extraordinary and compelling reasons"

warranting compassionate release. This Court should therefore reduce Copeland's sentence to

time served, convert the unserved portion of his sentence to supervised release, and modify his

conditions of supervision as appropriate, including by ordering a period of home incarceration.

## BACKGROUND

In 2003, Copeland was the getaway driver for a bank robbery in Brooklyn. While Copeland

waited outside, his co-defendants Virgil Rivers and Robertino Vasquez robbed the bank: Rivers

vaulted the teller counter and gathered $3,710 in cash from the teller drawers; Vasquez kept the

customers and employees at bay with a loaded handgun. Copeland drove the group from the scene.

After a short police pursuit, the car crashed and all three were arrested. PSR ¶¶ 5–6. A jury

convicted Copeland of: (i) conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371; (ii)

armed bank robbery, 18 U.S.C. § 2113(d); and (iii) brandishing a firearm during and in relation to

a crime of violence, namely, bank robbery, 18 U.S.C. § 924(c)(1)(A)(ii). Dkt. No. 187, at 1.

At sentencing in 2005, this Court determined that Copeland was a career offender (based

on prior federal bank robbery convictions), calculated a Guidelines range of 360 months to life,

and sentenced Copeland to an aggregate term of 280 months. Sent'g Tr. 18–19, 45; Dkt. No. 187,

2

at 2. This Court noted several factors that warranted a downward variance from the Guidelines range. First, although Copeland's criminal history was serious, he was "kind of a benign bank robber," in that "[t]here's no indication that he physically assaulted anyone, … no major physical harm that he visited upon any of his victims. … [H]e has a history of nonviolent bank robberies." Sent'g Tr. 29. (In fact, the jury acquitted Copeland of a felon-in-possession count involving the firearm that Vasquez brandished. *See* Dkt. No. 77, at 3–4; Trial Tr. 873. And the jury was instructed that it could convict Copeland of the armed bank robbery and § 924(c) counts on a *Pinkerton* theory of liability. Trial Tr. 774–76.). Second, Copeland had endured "tragic" "life circumstances," including a "lifetime battle" with heroin addiction, which began at age 12, when "he was introduced to heroin by an older gentleman who lived in the same housing project." Sent'g Tr. 44; PSR ¶ 87. Copeland's "life of drug addiction" was "a significant circumstance[] that very likely ha[d] been a factor" in his criminal history. Sent'g Tr. 46. Third, Copeland's advanced age (then 52) made it "unlikely that you are going to be committing any more bank robberies if and when you get out of jail at 70 … or 72." *Id.* at 45–46. "A lengthy sentence of 20 or 25 years"—this Court landed in the middle of that range, at 23 years and four months— would "as a practical matter, incapacitate him considering his age." *Id.* at 30. Copeland is serving his sentence, and his release date is August 18, 2023. *See* BOP, Inmate Locator, https://bit.ly/352WJXM.

In the 16-plus years that Copeland has spent incarcerated for these offenses, he has changed. As his counselor, L. Kwartin, writes: "Since arriving at FCI Fort Dix in 2013, Inmate Copeland has remained incident report free. Inmate Copeland is a leader in his religious community. Every staff member at the institution has had a positive interaction with inmate Copeland. Inmate Copeland has demonstrated tremendous growth as a worker and a human being while being under my direct supervision in the last six years." Exh. A (Kwartin Letter). Every

aspect of Copeland's institutional record reflects his transformation and rehabilitation. As Counselor Kwartin reports, Copeland has had no disciplinary infractions in six-plus years at Fort Dix. Although I do not have access to pre-2013 records, it is my understanding that Copeland has had no disciplinary infractions at all during his entire term of imprisonment. He has built a steady work history, "always accepting and completing all duties thrown his way." *Id.* Copeland has risen from unit orderly, to floor coordinator, to his present position, building coordinator, where he is "responsible for: opening and closing units, training new orderlies, overall building sanitation, outside grounds sanitation, floor maintenance, and special cleanup detail." *Id. See also* Exh. B (BOP, Individualized Reentry Plan—Program Review), at 1. In addition, Copeland has participated in numerous BOP programs. *Id.* at 1–2. To combat his long history of heroin addiction, *e.g.*, PSR ¶¶ 87–92; Sent'g Tr. 12–13; Copeland has completed nonresidential drug treatment and drug education programs. Exh. B, at 2. He has designed and taught courses for other inmates, including Breaking Cycles of Unproductiveness, Critical Elevated Thinking, and Enlightenment for Spiritual and Moral Development. *Id.* at 1–2.

At the same time, Copeland's health has deteriorated with age. He is 67 years old. Exh. B, at 1. He suffers from hypertension, for which he is prescribed hydrocholorothiazide. Exh. C (BOP Health Services, Health Problems), at 1; Exh. D (BOP Health Services, Medication Summary Historical), at 1; Ex. E (BOP Health Services, Clinical Encounter of Nov. 25, 2019), at 1, 4–5. He has long battled chronic Grade 2/Stage 1 hepatitis C (now in remission), which has resulted in mild piecemeal necrosis of the liver and mild lobular inflammation, and for which he was prescribed Mavyret as recently as 2019. Exh. C, at 2; Exh. D, at 2; Exh. E, at 1, 4–5. He has been classified pre-diabetic ("pre-DM") and "is being counseled" for "diabetes mellitus management." Exh. F (BOP Health Services, Patient Education Assessment & Topics), at 1; *see* Exh. E, at 1, 5. He has

4

hyperlipidemia, for which he is prescribed atorvastatin. Exh. C, at 1; Exh. D, at 1; Exh. E, at 1, 4–5. He has long experienced Vitamin D deficiency, for which he receives no treatment. Exh. C, at 1; Exh. E, at 1, 4–5. An abdominal ultrasound in 2017 revealed aortic atherosclerotic disease. Exh. G (Abdominal Ultrasound Report). While incarcerated at USP Allenwood in 1996, Copeland was treated for tuberculosis, and he still has latent tuberculosis infection ("LTBI") today. PSR ¶ 86; Exh. C, at 1; Exh. E, at 1, 4–5. In short, Copeland possesses the declining health profile of a 67-year-old man who has spent the better part of his life incarcerated.

In the past two months, the COVID–19 pandemic has swept the United States. As of April 25, the virus has infected 895,766 people and killed 50,439. CDC, Cases of Coronavirus Disease (COVID–19) in the U.S., https://bit.ly/3bCcYO8. BOP has reported 730 confirmed cases among inmates, 317 among staff, and 26 inmate deaths. BOP, COVID–19 Cases, https://bit.ly/3clOkRX. The proliferation of COVID–19 in BOP has been dramatic:



This comes as no surprise. "[C]onditions of confinement—sharing small cells, eating together, using same bathrooms and sinks, delays in medical evaluation and treatment, and rationed access

to soap—make prisons more potentially conducive to the transmission of COVID-19 than elsewhere." *United States v. Haney*, 2020 WL 1821988, at *6 (S.D.N.Y. Apr. 13, 2020). "Jails and prison are powder kegs for infection. People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment." *United States v. Skelos*, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020). "Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID–19 within jails and prisons." Exh. H (Aff. of Brie Williams, M.D.), at ¶ 7.

Fort Dix, where Copeland is incarcerated, conforms to this alarming trend. Fort Dix has 29 confirmed inmate cases and two confirmed staff cases. BOP, COVID–19 Cases, https://bit.ly/3clOkRX. As recently as April 6, no inmates had tested positive. *See* Exh. I (Email of Apr. 6, 2020). And these numbers understate the true figure. BOP only tests "[s]ymptomatic inmates with exposure risk factors." BOP, BOP Implementing Modified Operations, https://bit.ly/3eRHoxE. But many carriers display no symptoms. *See* Arons et al., Presymptomatic SARS–CoV–2 Infections and Transmission in a Skilled Nursing Facility, New England Journal of Medicine (Apr. 24, 2020) (finding that in study population, "more than half of the residents with positive tests were asymptomatic at the time of testing"), *available at* https://bit.ly/2KDcj2R. And because asymptomatic carriers play a significant role in spreading the coronavirus, "[i]nfection-control strategies focused solely on symptomatic residents" are "not sufficient to prevent transmission" after the virus's introduction into a facility. *Id.* Moreover, inmates at Fort Dix live in communal settings such as dormitories and shared cells. Even under BOP's modified operations plan, inmates congregate for meals, for showers, and to use the shared computers and telephones that link them to their lawyers and families.

On April 6 and 7, through counsel, Copeland submitted email requests to Fort Dix's warden for immediate compassionate release to home confinement. Exh. I (Emails of April 6 and April 7, 2020). He cited his age, medical conditions, and risk of severe illness, and specified that if released, he would reside with Linda Johnson, his partner of 50 years, at her apartment in Brooklyn. The warden responded by letter to counsel, acknowledging receipt, but stating: "[A]s inmate Copeland is capable of making his own request, your submission on his behalf will not be considered." *Id.* (Letter of April 7, 2020). That response conflicts with the express language of BOP's own regulation concerning requests for compassionate release, which provides: "The Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request. Staff shall refer a request received at the Central Office to the Warden of the institution where the inmate is confined." 28 C.F.R. § 571.61(b). *See also, e.g.*, *United States v. Gross*, 2020 WL 1862251, at *1 n.1 (S.D.N.Y. Apr. 14, 2020) (deeming date that BOP confirmed receipt of counsel's submission date of receipt for purposes of § 3582(c)(1)(A), and citing § 571.61(b)); BOP, Program Statement 5050.50, § 2 (reproducing § 571.61(b), and providing that "[a] request for a [reduction in sentence] is considered 'submitted' for the purposes of 18 U.S.C. § 3582(c)(1) when it is received by the Warden in accordance with this section"). Nonetheless, once counsel told Copeland of the warden's response, Copeland resubmitted counsel's email requests himself. The warden has not responded to Copeland's resubmission.

## ARGUMENT

## I.     This Court Should Reduce Copeland's Sentence To Time Served.

Section 3582(c)(1)(A)(i) empowers this Court to order compassionate release if "extraordinary and compelling reasons" so warrant. That statutory phrase, read in conjunction with § 1B1.13 and Application Note 1, as well as BOP Program Statement 5050.50, encompasses

7

at least three sets of circumstances present here: (i) Copeland's age and underlying health conditions place him at high risk of severe illness and death should he contract the COVID–19 virus that has come to Fort Dix; (ii) Copeland is at least 65, is suffering from aging-related health deterioration, and has served at least 10 years of his sentence; and (iii) Copeland is at least 65 and has served at least 75% of his sentence. In light of Copeland's evident rehabilitation and his unique health risks, a sentence reduction to time served (about 229 months, still a stiff term) would not endanger the public and would comport with the 18 U.S.C. § 3553(a) factors. Finally, § 3582(c)(1)(A)'s exhaustion requirement is satisfied. Through counsel, Copeland submitted his request to the warden in accordance with the pertinent regulation and program statement, but the warden refused to consider the request. The administrative process is therefore unavailable. *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). In addition, this Court may adjudicate Copeland's motion without waiting the 10 days left on § 3582(c)(1)(A)'s 30-day clock. That provision, meant to accelerate rather than impede judicial review, is non-jurisdictional, waivable, and appropriately waived here, where each day that passes threatens Copeland with catastrophic harm.

## A.    Legal Framework

As amended by the First Step Act, § 3582(c)(1)(A)(i) provides that this Court:

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [§ 3553(a)] to the extent that they are applicable, if it finds that ... extraordinary and compelling reasons warrant such a reduction ...
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

First Step Act of 2018, § 603(b), Pub. L. No. 115–391, 132 Stat. 5194, 5239 (codified at § 3582(c)(1)(A)(i)). The "applicable policy statement[]," § 1B1.13, authorizes a sentence

reduction if "[e]xtraordinary and compelling reasons warrant the reduction" and "[t]he defendant

is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C.

§ 3142(g)." §§ 1B1.13(1) and (2).

Application Note 1 to § 1B1.13 defines "extraordinary and compelling reasons" to include at

least three sets of circumstances satisfied here:

- "Medical Condition of the Defendant: … The defendant is suffering from a serious physical or medical condition, … or experiencing deteriorating physical ... health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13 cmt. n.1(A)(ii)(I) and (III).
- "Age of the Defendant: The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her sentence, whichever is less." § 1B1.13 cmt. n.1(B).
- "Other Reasons: As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary or compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." § 1B1.13 cmt. n.1(D). And BOP has determined that compassionate release may be available, without regard to medical condition, to "[i]nmates 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentence." BOP, Program Statement 5050.50, *supra*, § 4(c).

Copeland's request fits squarely into each.

In any event, Application Note 1's list is illustrative, not exhaustive. As Judge Dearie has

explained, this Court has the independent authority, apart from the Sentencing Commission or

BOP, to determine what constitutes "extraordinary and compelling reasons" for release, and is not

limited by the examples in Application Note 1 or Program Statement 5050.50. *United States v.*

*Haynes*, 2020 WL 1941478, at *11–15 (E.D.N.Y. Apr. 22, 2020) (RJD) (so ruling, and collecting

cases); *United States v. Rodriguez*, 2020 WL 1627331, at *2–6 (E.D. Pa. Apr. 1, 2020) (same).

**B.    Copeland's Age, Hypertension, And Multiple Additional Comorbidities, Coupled With The Prevalence Of COVID–19 At Fort Dix, Constitute "Extraordinary And Compelling Reasons" Warranting Release Under Application Note 1(A).**

Copeland's age and multiple underlying medical conditions place him at high risk of

9

severe illness and death from COVID–19. Copeland is 67 years old, a well-established risk factor. The CDC has specifically identified people 65 and older as being "at high-risk for severe illness from COVID–19." CDC, People Who Are at High Risk for Severe Illness, https://bit.ly/2ztvB8O. Indeed, in an early report, the CDC found that "[o]verall, 31% of cases, 45% of hospitalizations, 53% of ICU admissions, and 80% of deaths associated with COVID-19 were among adults aged ≥65 years ... . Similar to reports from other countries, this finding suggests that the risk for serious disease and death from COVID-19 is higher in older age groups." CDC COVID–19 Response Team, Severe Outcomes Among Patients with Coronavirus Disease 2019—United States, February 12–March 16, 2020 (March 27, 2020) ("CDC, March 27 Report"), *available at* https://bit.ly/2Y2xeEB. A more recent CDC report finds that COVID–19 "[h]ospitalization rates increased with age," and that for those ages 65–74, the rate was 12.2 per 100,000 population, as opposed to 4.6 overall. Garg et al., Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019—COVID–NET, 14 States, March 1–30, 2020 (Apr. 17, 2020) ("CDC, April 17 Report"), *available at* https://bit.ly/2yD75BM. Finally, a Journal of the American Medical Association report from last week made consistent, indeed, worse, findings: the median age for 5,700 COVID–19 hospitalizations in the New York City area was 63; the mortality rate rose steadily with age, and was 18.7% for those in Copeland's cohort (men aged 60–69); and those 60 and older accounted for 86% of deaths. Richardson et al., Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID–19 in the New York City Area (Apr. 22, 2020) ("JAMA, April 22 Report"), *available at* https://bit.ly/3eNqvo3. There is no doubt that "COVID–19 poses an increased risk to elderly individuals." *United States v. Asaro*, 2020 WL 1899221, at *3 (E.D.N.Y. Apr. 17, 2020) (ARR); *see also, e.g.*, *United States v. Hansen*, 2020 WL 1703672,

at *8 (E.D.N.Y. Apr. 8, 2020) (KAM) ("[T]he court acknowledges the unique risks posed by the COVID–19 pandemic to prisoners ... who [are] elderly and infirm.").

Copeland also has hypertension, another well-established risk factor. Hypertension has "been associated with increased illness severity and adverse outcomes" from COVID–19. CDC, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID–19), https://bit.ly/3cjQyRM. A World Health Organization report found that "individuals at highest risk for severe disease and death include people aged over 60 years and those with underlying conditions such as hypertension." WHO, Report of the WHO–China Joint Mission on Coronavirus Disease 2019 (COVID–19), at 12 (Feb. 24, 2020), *available at* https://bit.ly/2yJWBQN. The WHO has found that the mortality rate among those with hypertension is 8.4%, compared to 1.4% for those otherwise healthy. *Id. See also* CDC COVID–19 Response Team, Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019—United States, February 12–March 20, 2020 (Apr. 3, 2020) ("CDC, April 3 Report") (concluding, "consistent with findings from China and Italy," that "patients with underlying health conditions and risk factors, including ... hypertension, ... might be at higher risk for severe disease or death from COVID–19"), *available at* https://bit.ly/2VWMa4r. The CDC's April 17 Report found that hypertension was the most single common comorbidity for COVID–19, appearing in 49.7% of all patients and 72.6% of those 65 and older. The JAMA's April 22 Report agrees, finding that the hypertension was the single most common comorbidity, appearing in 56.6% of all patients. Again, courts have recognized the risk that hypertension poses. *E.g.*, *United States v. Scparta*, 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020) ("The [CDC] has identified hypertension as a comorbidity that increases the likelihood of serious risk from COVID–19."); *United States v. Sawicz*, 2020 WL

11

1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (ARR).

Copeland's age and hypertension, beyond dispute, elevate his risk, and suffice to warrant relief. But he also suffers from a cluster of other conditions that may have the same effect, either today or if they worsen. For example, Copeland has aortic atherosclerotic disease, and "patients with underlying health conditions and risk factors including ... coronary artery disease ... might be at higher risk for severe disease or death." CDC, April 3 Report. Multiple studies have identified coronary artery disease as a prevalent comorbidity. *E.g.*, CDC, April 17 Report (observing coronary artery disease in 14.2% of all patients, and 25.4% of those aged 65 and older); JAMA, April 22 Report (observing coronary artery disease in 11.1% of all patients). Copeland also has hepatitis C, and "some people living with ... hepatitis C who also have other conditions such as hypertension ... will likely have an increased risk of serious illness if they get COVID–19." World Hepatitis Alliance, Coronavirus (COVID–19, SARS–CoV–2) and Viral Hepatitis: Sources of Information (March 26, 2020), https://bit.ly/2Y2VXJ1. Copeland has latent tuberculosis, and a preprint publication has concluded that infection with the M. tuberculosis pathogen "likely increases susceptibility to SARS–CoV–2, and increases COVID–19 severity." Liu et al., Active or Latent Tuberculosis Increases Susceptibility to COVID–19 and Disease Severity (March 16, 2020), *available at* https://bit.ly/2ztH0FC. *See also, e.g.*, *United States v. Atwi*, 2020 WL 1910152, at *5 (E.D. Mich. Apr. 20, 2020) (discussing latent tuberculosis as potential risk factor, and granting compassionate release); *Doe v. Barr*, 2020 WL 1820667, at *5 (N.D. Cal. Apr. 12, 2020) (same; granting release from immigration detention). And Copeland has pre-diabetes; should that condition degenerate into diabetes, the risk would be manifest. *See* CDC, People Who Are at High Risk for Severe Illness, (listing "[p]eople with diabetes"), https://bit.ly/2ztvB8O.

This unique constellation of Copeland's age, his risk factors, and the emergence of

COVID–19 at Fort Dix, establish "extraordinary and compelling reasons" to grant compassionate release pursuant to § 3582(c)(1)(A)(i) and U.S.S.G. § 1B1.13 cmt. n.1(A)(ii). "The COVID–19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration." *United States v. Hernandez*, 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020). "Confined to a small cell where social distancing is impossible," a high-risk inmate such as Copeland "cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus." *United States v. Perez*, 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020). And "realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself." *Hernandez*, 2020 WL 1684062, at *3. Thus, "numerous courts have recently concluded that 'extraordinary and compelling reasons' exist for purposes of the policy statement where inmates suffer from medical conditions that place them at a higher risk of serious illness in the event they contract COVID-19." *Gross*, 2020 WL 1862251, at *3. *See also United States v. Smith*, 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020).

Numerous courts have relied on many of these precise conditions to grant § 3582(c)(1)(A)(i) motions. *E.g.*, *United States v. Bess*, 2020 WL 1940809 (W.D.N.Y. Apr. 22, 2020) (64 years old; multiple conditions, including coronary artery disease and hypertension); *Scparta*, 2020 WL 1910481 (multiple conditions, including hypertension); *Atwi*, 2020 WL 1910152 (latent tuberculosis); *United States v. Joling*, 2020 WL 1903280 (D. Or. Apr. 17, 2020) (multiple conditions, including hypertension and atherosclerosis); *Samy v. United States*, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020) (72 years old; multiple conditions, including hypertension); *United States v. Ben-Yhwh*, 2020 WL 1874125 (D. Haw. Apr. 13, 2020) (73 years old; multiple conditions, including hypertension); *United States v. Burrill*, 2020 WL 1846788

13

(N.D. Cal. Apr. 10, 2020) (75 years old; multiple conditions, including hypertension); *Sawicz*,

2020 WL 1815851 (hypertension); *Miller v. United States*, 2020 WL 1814084 (E.D. Mich. Apr.

9, 2020) (69 years old; multiple conditions, including coronary artery disease, hypertension, and

hepatitis C); *United States v. Zukerman*, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020) (multiple

conditions, including hypertension); *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2,

2020) (multiple conditions, including hypertension); *United States v. Rodriguez*, 2020 WL

1627331 (E.D. Pa. Apr. 1, 2020) (multiple conditions, including hypertension); *United States v.

Muniz*, 2020 WL 1540325 (S.D. Tex. March 30, 2020) (multiple conditions, including

hypertension). Copeland's request fits comfortably within this growing body of law.

**C.     Copeland's Age, Deteriorating Physical Health, And His Service Of 19 Years Of A
23-Year Sentence, Constitute "Extraordinary And Compelling Reasons" Warranting
Release Under Application Notes 1(B) and 1(D).**

Apart from the pandemic, Copeland's age, deteriorating health, and the completion of 19

years of his 23-year sentence, warrant release under Application Notes 1(B) and 1(D). With

respect to Application Note 1(B), there can be no dispute that Copeland meets the first and third

criteria: he "is at least 65 years old" and "has served at least 10 years ... of his sentence."

§ 1B1.13 cmt. n.1(B)(i) and (iii). As described above (at 5–6), he also satisfies the second

criterion: he "is experiencing a serious deterioration in physical ... health because of the aging

process." § 1B1.13 cmt. n.1(B)(ii). When Copeland was sentenced in 2005, he was 52 years old

and "enjoy[ed] good physical health." PSR ¶ 86. That is no longer true. As he has grown older,

Copeland has developed multiple serious diseases of aging. For example, he has developed

hypertension, which "causes over 7 million premature deaths per year and contributes to 4.5% of

the total disease burden worldwide. ... [O]lder adults account for the bulk of hypertension-related

morbidity and mortality—due largely to dramatically greater prevalence among the elderly."

Buford, Hypertension and Aging, Ageing Res. Rev. (March 2016), *available at* https://bit.ly/2KzRJAx. *See also, e.g.*, Lionakis et al., Hypertension in the Elderly, World J. Cardiology (May 2012) ("Data collected over a 30-year period have demonstrated the increasing prevalence of hypertension with age."), *available at* https://bit.ly/2VFY5Vz; Mateos-Caceres et al., New and Old Mechanisms Associated with Hypertension in the Elderly, Int'l J. Hypertension (Oct. 20, 2011) ("Age is a powerful risk factor for hypertension, death, and cardiovascular death. In this regard, high blood pressure in the elderly confers a three- to fourfold increase in risk for cardiovascular disease, compared to younger individuals."), *available at* https://bit.ly/3eUc3dN.

Likewise, Copeland has developed aortic atherosclerosis, which "is a major cause of death in the Western world. ... Increasing evidence indicates that aging is ... an important risk factor for atherosclerosis and persists as an independent factor when all other known factors are controlled." Wang et al., Mechanisms, Functional Consequences, and Potential Therapeutics for Cellular Senescence, Aging & Atherosclerosis (July 6, 2012), *available at* https://bit.ly/2S7DkQk. And old age is associated with worse outcomes for several of Copeland's other conditions, for example, hepatitis C. *See* Reid et al., Hepatitis C Virus Infection in the Older Patient, Infectious Disease Clinics of N. Am. (Dec. 2017) (literature review; discussing one study finding that increased risk of cirrhosis, hepatocellular carcinoma, and death from hepatitis C among those 65 or older, and others finding that "older age ... may also play a role in the progression of HCV-associated liver disease), *available at* https://bit.ly/3eQcG89. Accordingly, Copeland's multiple degenerative diseases of aging satisfy Note 1(B)(ii). *See, e.g.*, *United States v. Davis*, 2020 WL 1083158, at *2 & n.5 (D. Md. March 5, 2020) (finding Note 1(B)(ii) satisfied, and granting compassionate release, based on multiple conditions, including hypertension and atherosclerosis).

With respect to Application Note 1(D), the analysis is even simpler. Section 4(c) of

15

Program Statement 5050.50 sets forth only two criteria: an inmate must be (i) age 65 or older, and (ii) have served the greater of 10 years or 75% of his term of imprisonment. *See Hansen*, 2020 WL 1703672, at *6 (explaining that § 4(c) "expands the definition of 'extraordinary and compelling reasons' to cover age even when the inmate has no medical condition"). Copeland is 67. He has been incarcerated since September 29, 2003, PSR p.1, so he has served 199 calendar months, or 16 years and seven months. A federal prisoner accrues 54 days of good time credit per year, *see* 18 U.S.C. § 3621(b)(2), so Copeland has accrued about 895 days, or 30 months. Counting good time credit, he has therefore served 229 months of a 280-month sentence, or 81.8%. To put the calculation differently, Copeland's sentence has been running since September 29, 2003, and BOP projects that it will end on August 18, 2023, about 239 calendar months later. Copeland has served 199 calendar months of that period, or 83.3%. Either way, Copeland has served enough of his sentence to establish § 4(c) eligibility.

Finally, Copeland reiterates that this Court is not limited to the precise sets of circumstances set forth in Application Note 1 and Program Statement 5050.50. Rather, this Court can consider all of Copeland's personal circumstances, as well as the unprecedented public health crisis created by the COVID–19 pandemic, in deciding whether to grant compassionate release. *See Haynes*, 2020 WL 1941478, at *11–15; *Rodriguez*, 2020 WL 1627331, at *2–6.

**D.    Copeland's Release Will Not Endanger The Community, And A Reduction To Time Served Comports With The § 3553(a) Factors.**

Section 1B1.13(2) provides that this Court may reduce a defendant's sentence if he "is not a danger to the safety of any other person or to the community." Copeland acknowledges that a jury convicted him of serious crimes, and that he has a significant, albeit dated, criminal history. But Copeland's advanced age and his manifest rehabilitation confirm that he poses no such danger today. At sentencing, this Court observed that Copeland "has a history of nonviolent bank

16

robberies," and determined that "a lengthy sentence of 20 or 25 years is going, as a practical matter, [to] incapacitate him considering his age." Sent'g Tr. 29–30. Indeed, this Court found it "unlikely that you are going to be committing any more bank robberies if and when you get out of jail at 70 or ... 72." *Id.* at 45–46. Copeland's institutional record in the 15 years since sentencing confirms that this Court was correct. Copeland has incurred no disciplinary infractions. He has done an "exceptional job performing his duties" on his work detail, earning promotion after promotion. Exh. A. He has addressed the root cause of his criminal history, heroin addiction, by completing nonresidential drug treatment and drug education programs. Moreover, "older offenders are substantially less likely to recidivate following release than younger cohorts. ... Older offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses." U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 30 (Dec. 2017), *available at* https://bit.ly/2SbpxZ8. Only 13.4% of those older than 65 upon release were rearrested, 6.5% were reconvicted, and 4.1% were reincarcerated; in contrast, for those aged 21–24 upon release, the corresponding percentages were 66.6%, 48.4%, and 38.6%. *Id.* at 23 figs.13–15. *See also* The Osborn Ass'n, The High Costs of Low Risk: The Crisis of America's Aging Prison Population 11 (May 2018) ("Nationwide, 43.3 percent of all released individuals recidivate within three years, while only ... four percent of those over 65 return to prison for new convictions."), *available at* https://bit.ly/2Y18r3Q.

In addition, immediate release comports with the § 3553(a) factors. In particular, the COVID–19 pandemic, which no one could have foreseen at the time of sentencing, requires this Court to pay particular heed to §§ 3553(a)(1) (Copeland's "history and characteristics") and 3553(a)(2)(D) (the "need to provide" Copeland with "needed ... medical care" "in the most effective manner"). As to the former factor, Copeland's age and serious medical conditions now

17

carry dispositive weight. An extended term of incarceration for a 67-year-old man with hypertension, atherosclerosis, hepatitis C, latent tuberculosis, and other comorbidities, in a facility where the virus is prevalent and spreading, poses a significant threat of severe illness and death. As to the latter factor, if Copeland is released, he will reside with Linda Johnson, his partner of more than 50 years, *see* PSR ¶¶ 79–81, at her apartment in Brooklyn. This environment will "most effective[ly]" allow Copeland to take the precautions essential to protect himself from contracting COVID–19: self-isolation, social distancing, hygiene, and sanitation. Whatever measures BOP is taking at Fort Dix cannot substitute for the safety of a single-family apartment.

As discussed above, counting good time, Copeland has served about 229 months. That is a substantial term, and there is no danger that the public, or Copeland, will perceive him to have gotten off lightly. *See* § 3553(a)(2)(A). Moreover, Copeland's maturation and rehabilitation reduce the need for deterrence and incapacitation today. *See* §§ 3553(a)(2)(B) and (C); *Pepper v. United States*, 562 U.S. 476, 490–91 (2011) (holding that district court conducting resentencing proceeding "may consider evidence of a defendant's rehabilitation since his prior sentencing" as basis for "downward variance," and explaining that such evidence "may be highly relevant" to §§ 3553(a)(2)(B) and (C)). Finally, this Court can convert the unserved portion of Copeland's sentence to a term of supervised release, *see* § 3582(c)(1)(A), in addition to the five-year term already imposed. And this Court can modify the release conditions as appropriate, including by ordering home incarceration. *Id.*; *see also* 18 U.S.C. §§ 3563(b)(19), 3583(d), 3583(e)(2). Reweighing the § 3553(a) factors for defendants who, like Copeland, have served long terms of imprisonment and find themselves at high risk from the COVID–19 pandemic, courts have deemed sentence reductions more substantial than what Copeland seeks appropriate. *E.g.*, *United States v. Hammond*, 2020 WL 1891980 (D.D.C. Apr. 16, 2020) (reducing approximately 30-year

18

sentence for violent gunpoint robbery to 18 years).

In a recent essay urging decarceration of elderly and rehabilitated prisoners, Joseph Margulies writes of inmates serving long sentences who have "made the turn"—those who "have thoroughly abandoned their prior way of navigating the world. Margulies, Let the People Go, Boston Review (Apr. 20, 2020), https://bit.ly/3ayuode. They "look back on their past with a mixture of astonishment, revulsion, and regret. Many of them committed very serious crimes, but they will never run afoul of the law again." *Id.* Copeland too has made the turn: "[t]he person who entered prison" in 2003 "simply no longer exists," *id.*, and this Court should so recognize.

**E.     The Exhaustion Requirement Is Satisfied.**

Finally, Section 3582(c)(1)(A) provides that a court may grant compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." This provision poses no impediment to Copeland's immediate compassionate release.

First, the warden's refusal to accept counsel's request for compassionate release, in direct contravention of BOP's own regulation and program statement, renders the administrative process unavailable. "[A]n administrative procedure is unavailable when (despite what regulations or guidance materials may say) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859. In a hypothetical that captures this case, *Ross* explained: "Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then 'capable of use' for the pertinent purpose." *Id.* Here, § 571.61(b) provides: "The Bureau of

19

Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request. Staff shall refer a request received at the Central Office to the Warden of the institution where the inmate is confined." *See also* Program Statement 5050.50, § 2 (quoting § 571.61(b), and providing that a request for compassionate release "is considered 'submitted'" when "received by the Warden in accordance with this section"). In reliance on this regulation and program statement, counsel requested compassionate release by emailing Fort Dix's central office on Copeland's behalf. Counsel's emails reached the warden, but the warden refused to consider them—even though other BOP facilities, including the MCC and MDC, accept submissions from counsel, and even though it serves no purpose, in this time of great urgency, to enforce such a purposeless (not to mention nonexistent) requirement. Copeland need not exhaust an administrative process that ignores its own rules.

Second, this Court need not wait until May 6, 2020 (30 days from the submission of Copeland's request to the warden on April 6, 2020, *see* Exh. I) before granting this motion. As recent opinions by Judges Liman, Rakoff, Keenan, and Ross explain in detail, § 3582(c)(1)(A)'s exhaustion provision is non-jurisdictional, subject to waiver, and properly waived in light of the exigencies created by the COVID–19 pandemic. *United States v. Russo*, 2020 WL 1862294, at *3–7 (S.D.N.Y. Apr. 14, 2020) (Liman, J.) (analyzing exhaustion issue; concluding that court "can grant the requested relief on its own authority, given the extraordinary circumstances here, and because doing so would not be inconsistent with congressional intent"); *Haney*, 2020 WL 1821988, at *1–4 (Rakoff, J.) (same; concluding that "Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually favors such waiver, allowing courts to deal with the emergency before it is potentially too late"); *Smith*, 2020 WL 1849748, at *2–4 (Keenan, J.) (same; concluding that "the First Step

20

Act did not empower the Government with the sole authority to decide when and under what conditions exhaustion may be waived," and "agree[ing] ... that "judicial waiver is permissible in light of the extraordinary threat certain inmates face from COVID–19"); *Sawicz*, 2020 WL 1815851, at *2 (Ross, J.) (same; concluding that "[t]he COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension, justifies waiver," because the "delay that the defendant would experience if he had to wait for thirty days to expire before pursuing a motion for compassionate release in this court would put him at significant risk of suffering catastrophic health consequences"). *See also, e.g.*, *United States v. Livingston*, 2020 WL 1905202, at *1–2 (E.D.N.Y. Apr. 17, 2020) (ENV); *United States v. McCarthy*, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020); *Zukerman*, 2020 WL 1659880, at *4; *Colvin*, 2020 WL 1613943, at *2; *Perez*, 2020 WL 1546422, at *1–3 (all waiving exhaustion).

The argument is straightforward. Section 3582(c)(1)(A)'s exhaustion provision is non-jurisdictional. "A rule qualifies as jurisdictional only if 'Congress has clearly stated that the rule is jurisdictional.' 'Absent such a clear statement,' the Supreme Court has cautioned, 'courts should treat the restriction as nonjurisdictional in character, with the specific goal of 'ward[ing] off profligate use of the term 'jurisdiction.''" *Haney*, 2020 WL 1821988, at *2 (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013)). Section 3582(c)(1)(A) contains no language that speaks to jurisdiction, let alone the requisite clear statement. *Russo*, 2020 WL 1862294, at *4. Moreover, the Second Circuit has held that a related provision, § 3582(c)(2), is non-jurisdictional. *United States v. Johnson*, 732 F.3d 109, 116 n.1 (2d Cir. 2013). Finally, the government has waived exhaustion in certain cases and courts have accepted these waivers. *United States v. Dana*, 14 Cr. 405, (S.D.N.Y. Mar. 31, 2020), Dkt. No. 108; *United States v.*

21

*Marin*, 15 Cr. 252 (PKC) (E.D.N.Y. Mar. 30, 2020), Dkt. Nos. 1325–26. If exhaustion were

jurisdictional, failure to exhaust would have deprived these courts of adjudicatory authority,

notwithstanding the parties' consent. Indeed, the government itself concedes that exhaustion is

non-jurisdictional. *Russo*, 2020 WL 1862294, at *4; *Smith*, 2020 WL 1849748, at *3.

Because § 3582(c)(1)(A)'s exhaustion requirement is non-jurisdictional, it is instead a

claim-processing rule, which "do[es] not 'govern a court's adjudicatory capacity'" and "may, in

certain cases, be waivable by the parties or the courts." *Haney*, 2020 WL 1821988, at *2 (quoting

*Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)). "Even where exhaustion is seemingly

mandated by statute ... , the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118

(2d Cir. 2019). Rather, "[a] court may waive an administrative exhaustion requirement 'where

[exhaustion] would be futile, ... where the administrative process would be incapable of granting

adequate relief ... [or] where pursuing agency review would subject [the person seeking relief] to

undue prejudice.'" *Sawicz*, 2020 WL 1815851, at *2 (quoting *Washington*, 925 F.3d at 118–19).

*See also Perez*, 2020 WL 1546422, at *2–3 (applying same exceptions). The Second Circuit has

so confirmed by holding claim-processing exhaustion requirements in other statutory contexts

subject to equitable exceptions and judicial waiver. *E.g.*, *Grullon v. Mukasey*, 509 F.3d 107, 111

(2d Cir. 2007) (INA); *Boos v. Runyon*, 201 F.3d 178, 183 (2d Cir. 2000 (Rehabilitation Act); *New

York v. Sullivan*, 906 F.2d 910, 917–18 (2d Cir. 1990) (Social Security Act).

Here, because enforcement of the full statutory 30-day period would place Copeland at

grave risk of harm, this Court should waive the remaining 10 days. "[I]f the delay attending

exhaustion would subject claimants to deteriorating health, ... then waiver may be appropriate."

*Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992). Likewise, waiver is appropriate because

"enforcement of the exhaustion requirement would cause [Copeland] irreparable injury" by

risking "deteriorating health, and possibly even ... death." *Sullivan*, 906 F.2d at 918. Indeed, "even a few weeks' delay carries the risk of catastrophic health consequences for [Copeland]. ... [R]equiring him to exhaust administrative remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate." *Perez*, 2020 WL 1546422, at *3. "'[U]ndue delay, if it in fact results in catastrophic health consequences,' can justify waiving an administrative exhaustion requirement." *Sawicz*, 2020 WL 1815851, at *2 (quoting *Washington*, 925 F.3d at 120–21).

Moreover, judicial waiver of the exhaustion rule in the unique circumstances presented by the pandemic aligns with Congress's design. "Congress cannot have intended the 30-day waiting period of § 3582(c)(1)(A) to rigidly apply in the highly unusual situation in which the nation finds itself today." *Haney*, 2020 WL 1821988, at *3. Section 3582(c)(1)(A) "does not contain an exhaustion requirement in the traditional sense." *Id.* "That is, the statute does not necessarily require the moving defendant to fully litigate his claim before the agency (*i.e.*, the BOP) before bringing his petition to court. Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court." *Id.* Accordingly, it was at least as important to Congress that defendants receive prompt judicial review of compassionate release motions as it was that BOP have an opportunity to consider those motions in the first instance. Section 3582(c)(1)(A) therefore "does not reflect unqualified commitment to administrative exhaustion and it does reflect acknowledgement that the judiciary has an independent interest in, and responsibility for, the criminal judgments it is charged with imposing." *Russo*, 2020 WL 1862294, at *6. The statute's plain text therefore "evinces congressional intent that a defendant has a right to a prompt and

23

meaningful judicial determination of whether she should be compassionately released, regardless of whether administrative remedies have been exhausted." *Id.*

This is the critical point: " the 30-day rule was meant as an *accelerant* to judicial review." *Smith*, 2020 WL 1849748, at *4 (emphasis added). "[W]here each day that goes by threatens incarcerated defendants with greater peril," it would "pervert congressional intent to treat [the 30-day rule] as a substantial *obstacle* to effective judicial review." *Id.* (emphasis added). In practical terms, "each day a defendant must wait before presenting what could otherwise be a meritorious petition threatens him with a greater risk of infection and worse." *Haney*, 2020 WL 1821988, at *4. The "delay" that Copeland would experience if he had to wait 10 days for this Court to decide his motion "would put him at significant risk of suffering catastrophic health consequences." *Sawicz*, 2020 WL 1815851, at *2. "[I] the extraordinary circumstances now faced by prisoners as a result of the COVID–19 virus and its capacity to spread in swift and deadly fashion, the objective of meaningful and prompt judicial resolution is clearly best served by permitting [Copeland] to seek relief before the 30-day period has elapsed." *Haney*, 2020 WL 1821988, at *4.

## CONCLUSION

This Court should grant Copeland's motion, reduce his sentence to time served, convert the unserved portion of his sentence to a term of supervised release, and modify the conditions of supervision as appropriate, including by ordering a term of home confinement.

Dated:      New York, New York
            April 26, 2020


                    Respectfully submitted,

            FEDERAL DEFENDERS OF NEW YORK, INC.
            APPEALS BUREAU

                    By: /s/

            **DANIEL HABIB**
            Attorney for Movant-Defendant
                    **Edward Copeland**
            52 Duane Street, 10th Floor
            New York, New York 10007
            Tel.: (646) 484–1724

# EXHIBIT A

**U.S. Department of Justice**

Federal Bureau of Prisons

Memorandum

_Federal Correctional Institution_      _Fort Dix, NJ 08640_

Date:   04/15/2020

Reply to
Attn of:   L. Kwartin, Correctional Counselor

Subject:    Inmate Copeland #24627-037

To:     Daniel Habib, Attorney

On December 17, 2013 inmate Copeland arrived at FCI Fort Dix. On January 21, 2014 inmate Copeland was hired as a unit orderly. Upon being hired as an orderly inmate Copeland was given the responsibilities of cleaning bathrooms and showers within the inmate housing unit. After several months of performing his duties he was given more responsibilities like setting up rooms for new arrivals, sweeping and mopping floors and trash detail. In 2017 inmate Copeland was made floor coordinator of his housing unit. Inmate Copeland did an exceptional job performing his duties and earned the respect from the other inmates while helping them along the way. Because of inmate Copeland always accepting and completing all duties thrown his way, inmate Copeland was named building coordinator. While taking on this job inmate Copeland was responsible for: opening and closing units, training new orderlies, overall building sanitation, outside grounds sanitation, floor maintenance, and special cleanup detail for various infectious diseases.

Since arriving at FCI Fort Dix in 2013, Inmate Copeland has remained incident report free. Inmate Copeland is a leader in his religious community. Every staff member at the institution has had a positive interaction with inmate Copeland. Inmate Copeland has demonstrated tremendous growth as a worker and human while being under my direct supervision in the last six years.

# EXHIBIT B



**Individualized Reentry Plan - Program Review  (File copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: COPELAND, EDWARD T  24627-037

SEQUENCE: 00028950
Team Date: 11-05-2019

| | |
|---|---|
| Facility | FTD  FORT DIX FCI |
| Name: | COPELAND, EDWARD T |
| Register No.: | 24627-037 |
| Age: | 67 |
| Date of Birth: | |
| Proj. Rel. Date: | 01-27-2024 |
| Proj. Rel. Method: | GCT REL |

DNA Status: OTV01831 / 05-23-2011
CIMS Status: YES
CIMS Reconciled: N/A

**Inmate is subject to 18 U.S.C. 4042(B) Notification:**          **Yes**
CURRENT CONVICTION FOR A CRIME OF VIOLENCE
PRIOR CONVICTION FOR A CRIME OF VIOLENCE

**Inmate is subject to 18 U.S.C. 4042(C) Notification and Registration:**          **N/A**

**Offense Sentences**

| Charge | Terms In Effect |
|---|---|
| T18:371 (CT 1) - CONSPIRACY TO COMMIT BANK ROBBERY; T18:2113 (CT 2)  BANK ROBBERY. | 196 MONTHS |
| T18:924(C)(1)(A) (CT 3) - UNLAWFUL USE OF A FIREARM. | 84 MONTHS |

**Detainers**

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

**Current CMA Assignments**

| Assignment | Description | Start |
|---|---|---|
| BIR CERT Y | BIRTH CERTIFICATE - YES | 01-14-2020 |
| CFSR | CERT FOOD SINCERITY REMOVAL | 10-22-2005 |
| DEPEND N | DEPENDENTS UNDER 21 - NO | 01-14-2020 |
| PHOTO ID Y | PHOTO ID - YES | 01-14-2020 |
| RPP NEEDS | RELEASE PREP PGM NEEDS | 10-04-2005 |
| SSN CARD Y | SOCIAL SECURITY CARD - YES | 01-14-2020 |
| VET P/S N | PARENT/SPOUSE VETERAN - NO | 01-14-2020 |
| VETERAN N | VETERAN - NO | 01-14-2020 |
| V94 CVA913 | V94 CURR VIOL ON/AFTER 91394 | 10-04-2005 |
| V94 CVB913 | V94 CURR VIOL BEFORE 91394 | 11-28-1999 |
| V94 PV | V94 PAST VIOLENCE | 02-16-1997 |
| WA NO HIST | NO WALSH ACT OFFENSE HISTORY | 01-16-2008 |

**Current Work Assignments**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| FTD | 5841 ORD W | UNIT ORDERLY - 5841 | 01-21-2014 |

**Current Education Information**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| FTD | ESL HAS | ENGLISH PROFICIENT | 07-31-1991 |
| FTD | GED HAS | COMPLETED GED OR HS DIPLOMA | 06-01-1991 |

**Education Courses**

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| FTD GP | C | BLACK HISTORY | 02-20-2018 | 02-20-2018 |
| FTD GP | C | YOUNG MEN INCORPORATED - WEST | 06-29-2017 | 08-31-2017 |
| FTD GP | C | YOUNG MEN INCORPORATED - WEST | 05-24-2017 | 05-24-2017 |
| FTD GP | C | BLACK HISTORY MNTH CLASS | 01-09-2016 | 03-26-2016 |
| FTD GP | C | BLACK HISTORY SEMINAR | 03-28-2016 | 03-28-2016 |
| FTD GP | C | 7 HABITS OF EFFECTIVE PEOPLE | 07-07-2015 | 09-22-2015 |
| FTD GP | C | UNIT TEAM DVLPMNT SKILLS PRGRM | 06-08-2015 | 06-08-2015 |
| FTD GP | C | APPRENTICESHIP-HOUSEKEEPING | 11-18-2014 | 05-19-2015 |
| FTD GP | C | COMPUTER SKILLS VT-2:00-3:30PM | 10-14-2014 | 02-20-2015 |



**Individualized Reentry Plan - Program Review  (File copy)**

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: COPELAND, EDWARD T  24627-037

SEQUENCE: 00028950

Team Date: 11-05-2019

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| OTV GP | C | INSTRUCTOR BREAKING CYCLES | 07-25-2011 | 07-25-2011 |
| OTV GP | C | INSTRUCTOR CRITCL ELV THINKING | 04-25-2011 | 04-25-2011 |
| OTV GP | C | INSTRUCTOR-BREAKING CYCLES | 10-02-2010 | 10-05-2010 |
| OTV GP | C | INSTRUCTOR-ENLIGHTENMENT | 03-25-2010 | 07-05-2010 |
| OTV GP | C | CULTURAL DIVERSITY/AWARENESS | 01-10-2010 | 03-10-2010 |
| OTV GP | C | INSTRUCTOR-BREAKING CYCLES | 01-30-2010 | 02-03-2010 |
| OTV GP | C | INSTRUCTOR-BREAKING CYCLES | 08-08-2009 | 11-05-2009 |
| OTV GP | C | CRITICAL ELEVATED THINKING | 08-08-2009 | 11-08-2010 |
| OTV GP | C | CRITICAL ELEVATED THINKING | 11-05-2009 | 01-03-2010 |
| OTV GP | C | CRITICAL ELEVATED THINKING | 05-12-2009 | 07-12-2009 |
| OTV GP | C | DEALING WITH TEENAGERS | 02-17-2008 | 03-19-2008 |
| OTV GP | C | STEP TRAINING FOR PARENTING | 08-09-2007 | 09-28-2007 |
| OTV GP | C | EDUCATION ORIENTATION - AM | 06-21-2007 | 06-21-2007 |
| HAZ | C | PG USP PUB SPEAK TU 1830-1930 | 02-08-2006 | 04-07-2006 |

### Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

### ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|---|---|---|---|---|
| FTD GP | A-DES | TRANSFER RECEIVED | 12-17-2013 | CURRENT |
| GIL | A-DES | OTHER AUTH ABSENCE RETURN | 04-16-2013 | 12-16-2013 |
| GIL | A-DES | TRANSFER RECEIVED | 09-12-2012 | 04-16-2013 |
| OTV GP | A-DES | OTHER AUTH ABSENCE RETURN | 04-13-2011 | 08-29-2012 |
| OTV GP | A-DES | TRANSFER RECEIVED | 05-15-2007 | 04-13-2011 |
| HAZ | A-DES | TRANSFER RECEIVED | 05-08-2007 | 05-09-2007 |
| HAZ | A-DES | US DISTRICT COURT COMMITMENT | 09-28-2005 | 05-08-2007 |

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 10-14-2005 |
| CARE1-MH | CARE1-MENTAL HEALTH | 06-08-2010 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| LOWER BUNK | LOWER BUNK REQUIRED | 09-04-2019 |
| MED HOLD | MEDICAL HOLD - DO NOT TRANSFER | 08-13-2019 |
| PAPER | LEGACY PAPER MEDICAL RECORD | 12-19-2018 |
| REG DUTY W | REGULAR DUTY W/MED RESTRICTION | 05-16-2007 |
| YES F/S | CLEARED FOR FOOD SERVICE | 09-24-2012 |

### Current PTP Assignments

| Assignment | Description | Start |
|---|---|---|

*NO ASSIGNMENTS*

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| DRG I RQ C | DRG INTRV REQD: CONTRB TO OFF | 10-04-2005 |
| ED COMP | DRUG EDUCATION COMPLETE | 08-13-2009 |
| NR COMP | NRES DRUG TMT/COMPLETE | 03-12-2008 |

### FRP Details

| Most Recent Payment Plan |
|---|

| FRP Assignment: | COMPLT | FINANC RESP-COMPLETED | Start: 02-14-2006 |
|---|---|---|---|
| Inmate Decision: | AGREED | $150.00 | Frequency: SINGLE |
| Payments past 6 months: | $0.00 | Obligation Balance: $0.00 | |

Financial Obligations



**Individualized Reentry Plan - Program Review  (File copy)**

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: COPELAND, EDWARD T  24627-037

SEQUENCE: 00028950

Team Date: 11-05-2019

| Most Recent Payment Plan | | | | | |
|---|---|---|---|---|---|
| No. | Type | Amount | Balance | Payable | Status |
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | *** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***| | | |
| 2 | ASSMT | $300.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | *** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***| | | |

**Payment Details**

Trust Fund Deposits - Past 6 months:  $2,909.72                     Payments commensurate ?   Y

New Payment Plan:     ** No data **

**Progress since last review**

Has assisted unit team with A&O and continues to assist with sanitation in the unit.

**Next Program Review Goals**

Develop good work habits. Unit Team recommends to report timely, maintain more than favorable attendance record, no disciplinary reports; achieve positive monthly performance evaluations, through next TEAM

**Long Term Goals**

Develop and maintain a savings plan in preparation for release. Self-enroll and maintain active enthusiastic participation in a hobby craft program (Leather, Beads, Stick Work, Crochet, Drawing, or Painting). Meditate daily in a quiet environment to find inner peace and self-projection. Consult with Unit Team for informal Correctional Counseling to establish an atmosphere of open communications.

**RRC/HC Placement**

**Comments**

Judicial Recommendations: No.



**Individualized Reentry Plan - Program Review  (File copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: COPELAND, EDWARD T  24627-037

SEQUENCE: 00028950
Team Date: 11-05-2019

Name: COPELAND, EDWARD T
Register No.: 24627-037
Age: 67
Date of Birth: 10-08-1952

DNA Status: OTV01831 / 05-23-2011

---

Inmate   (COPELAND, EDWARD T. Register No.: 24627-037)

11/05/19
Date

Unit Manager / Chairperson          Case Manager

11/05/19                              11/05/19
Date                                  Date

---

EXHIBITS C-G
REDACTED

# EXHIBIT H

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
:
:
:
:
:
:
APPLICATION FOR RELEASE FROM          :     **AFFIDAVIT OF BRIE WILLIAMS,**
CUSTODY                                :     **M.D.**
:
:
:
:
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

I, Brie Williams, hereby affirm as follows:

1.      I am a doctor duly licensed to practice medicine in the State of California.

2.      I am currently a Professor of Medicine at the University of California, San Francisco ("UCSF") in the Geriatrics Division, Director of UCSF's Amend: Changing Correctional Culture Program, as well as Director of UCSF's Criminal Justice & Health Program. In that capacity, my clinical research has focused on improved responses to disability, cognitive impairment, and symptom distress in older or seriously ill prisoners; a more scientific development of compassionate release policies; and a broader inclusion of prisoners in national health datasets and in clinical research. I have developed new methods for responding to the unique health needs of criminal justice-involved older adults—including an evidence-based approach to reforming compassionate release policies and the design of a new tool to assess physical functioning in older prisoners. I was previously a consultant for the California Department of Corrections and Rehabilitation, as well as for other state prison systems.

3.      I have extensive experience working with vulnerable populations, in particular the incarcerated and the elderly.

4.      I submit this affidavit in support of any defendant seeking release from custody during the COVID-19 pandemic, so long as such release does not jeopardize public safety and the inmate can be released to a residence in which the inmate can comply with CDC social distancing guidelines.  The statements in this affidavit are based only on the current state of emergency and the circumstances described below.

**The Risk of Infection and Accelerated Transmission of COVID-19 within Jails and Prisons is Extraordinarily High.**

5.      Prisons and jails are not actually isolated from our communities: hundreds of thousands of correctional officers and correctional healthcare workers enter these facilities every day, returning to their families and to our communities at the end of their shifts, bringing back and forth to their families and neighbors and to incarcerated patients any exposures they have had during the day.  Access to testing for correctional staff has been "extremely limited," guards have reported a "short supply" of protective equipment, and prisons are not routinely or consistently screening correctional officers for symptoms.[1]

6.      The risk of exposure is particularly acute in pre-trial facilities where the inmate populations shift frequently.[2]  For example, despite the federal government's guidance to stay

---

[1] Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_ca/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

*See also* Daniel A. Gross, *"It Spreads Like Wildfire": The Coronavirus Comes to New York's Prisons*, The New Yorker (Mar. 24, 2020), https://www.newyorker.com/news/news-desk/it-spreads-like-wildfire-covid-19-comes-to-new-yorks-prisons; Josiah Bates, *'We Feel Like All of Us Are Gonna Get Corona.' Anticipating COVID-19 Outbreaks, Rikers Island Offers Warning for U.S. Jails, Prisons*, Time (Mar. 24, 2020), https://time.com/5808020/rikers-island-coronavirus/; Sadie, Gurman, *Bureau of Prisons Imposes 14-Day Quarantine to Contain Coronavirus*, WSJ (Mar. 24, 2020), https://www.wsj.com/articles/bureau-of-prisons-imposes-14-day-quarantine-to-contain-coronavirus-11585093075; Cassidy McDonald, *Federal Prison Workers Say Conflictings Orders on Coronavirus Response Is Putting Lives at Risk*, CBS News (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/.

[2] Emma Grey Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*, Wired (Mar. 24, 2020), https://www.wired.com/story/coronavirus-covid-19-jails-prisons/.

2

inside and many states' stay-in-place orders, many prosecutors are still arresting individuals and

seeking detention.[3]   Pre-trial detention facilities are still accepting new inmates who are coming

from communities where COVID-19 infection is rampant.  As of today's date, the Bureau of

Prisons is still moving inmates from facility to facility, including prisoners in New York.[4]

7.    Because inmates live in close quarters, there is an extraordinarily high risk of

accelerated transmission of COVID-19 within jails and prisons.  Inmates share small cells, eat

together and use the same bathrooms and sinks.  They eat together at small tables that are cleaned

only irregularly.  Some are not given tissues or sufficient hygiene supplies.[5]  Effective social

distancing in most facilities is virtually impossible, and crowding problems are often compounded

by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands.[6]

**Inmate Populations Also Have the Highest Risk of Acute Illness and Poor Health Outcomes if Infected with COVID-19.**

8.    There are more than 2.3 million people incarcerated in the United States[7]

---

[3] Stephen Rex Brown, *'Business as Usual' For Federal Prosecutors Despite Coronavirus, Nadler Writes, Calling for Release of Inmates*, N.Y. Daily News (Mar. 20, 2020), https://www.nydailynews.com/new-york/ny-nadler-doj-inmates-20200320-d6hbdjcuj5aitppi3ui2xz7tjy-story.html.

[4] Courtney Bublé, *Lawmakers, Union Urge Halt to All Prison Inmate Transfers*, Government Executive (Mar. 25, 2020), https://www.govexec.com/management/2020/03/lawmakers-union-urge-halt-all-prison-inmate-transfers/164104/; Hamilton, *Sick Staff, Inmate Transfers*; Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates*, ABC News (Mar. 23, 2020),https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416.

[5] Justine van der Leun, *The Incarcerated Person Who Knows How Bad It Can Get*, Medium (Mar. 19, 2020), https://gen.medium.com/what-its-like-to-be-in-prison-during-the-coronavirus-pandemic-1e770d0ca3c5 ("If you don't have money, you don't have soap or tissues."); Keri Blakinger and Beth Schwartzapfel, *How Can Prisons Contain Coronavirus When Purrell Is a Contraband?*, ABA Journal (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[6] Rosa Schwartzburg, *'The Only Plan the Prison Has Is to Leave Us To Die in Our Beds'*, The Nation (Mar. 25, 2020), https://www.thenation.com/article/society/coronavirus-jails-mdc/.

[7] Kimberly Kindy *et al.*, *'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat*, Washington Post (Mar. 25, 2020), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html.

3

approximately 16% of whom are age 50 or older.[8]  The risk of coronavirus to incarcerated seniors is high.  "Their advanced age, coupled with the challenges of practicing even the most basic disease prevention measures in prison, is a potentially lethal combination."[9]  To make matters worse, correctional facilities are often ill-equipped to care for aging prisoners, who are more likely to suffer from chronic health conditions than the general public.

9.      An estimated 39-43% of all prisoners, and over 70% of older prisoners, have at least one chronic condition, some of the most common of which are diabetes, hypertension, and heart problems.[10] According to the CDC, each of these conditions—as well as  chronic bronchitis, emphysema, heart failure, blood disorders, chronic kidney disease, chronic liver disease, any condition or treatment that weakens the immune response, current or recent pregnancy in the last two weeks, inherited metabolic disorders and mitochondrial disorders, heart disease, lung disease, and certain neurological and neurologic and neurodevelopment conditions[11]—puts them at a "high-risk for severe illness from COVID-19."[12]

---

[8] Brie Williams *et al.*, *Strategies to Optimize the Use of Compassionate Release from US Prisons*, 110 AJPH S1, S28 (2020), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305434; Kimberly A. Skarupski, *The Health of America's Aging Prison Population*, 40 Epidemiologic Rev. 157, 157 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5982810/.

[9] Weihua Li and Nicole Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*, The Marshall Project (Mar. 19, 2020), https://www.themarshallproject.org/2020/03/19/this-chart-shows-why-the-prison-population-is-so-vulnerable-to-covid-19.

[10] Brie A. Williams *et al.*, *How Health Care Reform Can Transform the Health of Criminal Justice-Involved Individuals*, 33 Health Affairs 462-67 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4034754/; Brie A. Williams *et al.*, *Coming Home: Health Status and Homelessness Risk of Older Pre-release Prisoners*, 25 J. Gen. Internal Med. 1038-44 (2010), *available at* https://link.springer.com/content/pdf/10.1007/s11606-010-1416-8.pdf; Laura M. Maruschak *et al.*, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, U.S. Dept of Justice (Oct. 4, 2016), at 5, *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[11] Harvard Health Publishing, *Coronavirus Research Center*, Harvard Medical School (Mar. 25, 2020), https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center.

[12] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: People Who Are at Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last updated Mar. 22, 2020).

10.     However, even many young federal prisoners suffer from asthma, rendering them also very vulnerable to coronavirus.[13]

11.     But it is not only the elderly, or those with preexisting medical conditions that are at risk of coronavirus in a correctional setting.  As of March 23, 2020, New York City reported that "[p]eople ranging in ages from 18 to 44 have accounted for 46 percent of positive tests."[14] Across the United States, 38% of those hospitalized are between the ages of 20 and 54 and 12% of the intensive care patients are between 20 and 44.[15]

12.     This data is of particular concern for inmate populations, since prisoners' physiological age *averages 10 to 15 years older* than their chronological age.[16]  Therefore, the consensus of those who study correctional health is that inmates are considered "geriatric, by the age of 50 or 55 years."[17]  It is not clear that prison health care administrations are taking accelerated ageing into account when determining the eligibility criteria for age-related screening tools and medical care protocols for coronavirus, potentially leaving large swathes of the prison population at risk.[18]

---

[13] Laura Maruschak, *Medical Problems of Jail Inmates*, Dep't of Justice (Nov. 2006), at p. 2, *available at* https://www.bjs.gov/content/pub/pdf/mpji.pdf.

[14] Kimiko de Freytas-Tamura, *20-Somethings Now Realizing That They Can Get Coronavirus, Too*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/nyc-coronavirus-young.html.

[15] *Id.*

[16] Brie A. Williams *et al.*, *Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care*, 102 Am. J. Public Health 1475-81 (2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/; *see also* Brie Williams *et al.*, *Detained and Distressed: Persistent Distressing Symptoms in a Population of Older Jail Inmates*, 64 J. Am. Geriatrics Soc. 2349-55 (2016), https://onlinelibrary.wiley.com/doi/pdf/10.1111/jgs.14310 ("For example, older jail inmates with an average age of 60 in this study reported poor or fair health [and] chronic lung disease . . . at rates similar to those reported by community-based lower income older adults with an average age of 72.").

[17] Brie A. Williams *et al.*, *The Older Prisoner and Complex Chronic Medical Care* 165-70 in World Health Organization, *Prisons and Health* (2014), https://pdfs.semanticscholar.org/64aa/10d3cff6800ed42dd152fcf4e13440b6f139.pdf.

13.     In one study, we found that inmates who died in hospitals were, on average, nearly two decades younger than non-incarcerated decedents, had significantly shorter hospitalizations, and had higher rates of several chronic conditions including cancer, liver disease and/or hepatitis, mental health conditions, and HIV/AIDS."[19]

**The Entire Community is at Risk If Prison Populations Are Not Reduced**

14.     As the World Health Organization has warned, prisons around the world can expect "huge mortality rates" from Covid-19 unless they take immediate action including screening for the disease.[20]

15.     As of March 24, 2020, at least 38 people involved in the New York City correctional system have tested positive for Covid-19.[21]  Already, three inmates and three staff at federal correctional facilities across the United States have tested positive for the coronavirus, according to the Federal Bureau of Prisons.[22]

16.     Jails and prisons are fundamentally ill-equipped to handle a pandemic.

17.     Medical treatment capacity is not at the same level in a correctional setting as it is in a hospital.  Some correctional facilities have no formal medical ward and no place to quarantine

---

[18] Brie A. Williams *et al.*, *Differences Between Incarcerated and Non-Incarcerated Patients Who Die in Community Hospitals Highlight the Need For Palliative Care Services For Seriously Ill Prisoners in Correctional Facilities and in Community Hospitals: a Cross-Sectional Study*, 32 J. Pallitive Med. 17-22 (2018), *available at* https://journals.sagepub.com/doi/pdf/10.1177/0269216317731547.

[19] *Id.* at 20.

[20] Hannah Summers, *'Everyone Will Be Contaminated'*: *Prisons Face Strict Coronavirus Controls*, The Guardian (Mar. 23, 2020), https://www.theguardian.com/global-development/2020/mar/23/everyone-will-be-contaminated-prisons-face-strict-coronavirus-controls.

[21] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons.*

[22] Ryan Lucas, *As COVID-19 Spreads, Calls Grow to Protect Inmates in Federal Prisons*, NPR (Mar. 24, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/24/820618140/as-covid-19-spreads-calls-grow-to-protect-inmates-in-federal-prisons.

sick inmates, other than the facilities' Special Housing Unit (SHU).[23]  While the cells in the SHU have solid doors to minimize the threat of viral spread in otherwise overcrowded facilities, they rarely have intercoms or other ways for sick inmates to contact officers in an emergency.[24]  This is particularly dangerous for those with COVID-19 infection since many patients with COVID-19 descend suddenly and rapidly into respiratory distress.[25]

18.     Even those facilities that do have healthcare centers can only treat relatively mild types of respiratory problems for a very limited number of people.[26]  This means that people who become seriously ill while in prisons and jails will be transferred to community hospitals for care. At present, access to palliative care in prison is also limited.

19.     Corrections officers may also be particularly vulnerable to coronavirus due to documented high rates of diabetes and heart disease.[27]  Prison staff in Pennsylvania, Michigan, New York and Washington state have tested positive for the virus, resulting in inmate quarantines. In Washington, D.C., a U.S. marshal who works in proximity to new arrestees tested positive for the virus, meaning dozens of defendants headed for jail could have been exposed.[28]  In New York,

---

[23] MCC New York COVID 19 Policy Memo, Mar. 19, 2020, https://www.documentcloud.org/documents/6818073-MCC-New-York-COVID-19-Policy-Memo.html; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[24] Brie Williams *et al.*, *Correctional Facilities in the Shadow of COVID-19: Unique Challenges and Proposed Solutions*, Health Affairs (Mar. 26, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/.

[25] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19–Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[26] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*; Li and Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*.

[27] Brie Williams, *Role of US-Norway Exchange in Placing Health and Well-Being at the Center of US Prison Reform*, https://ajph.aphapublications.org/doi/10.2105/AJPH.2019.305444 (published Jan. 22, 2020).

[28] Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, WSJ (Mar. 22, 2020), https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600 ("We're all headed for some dire consequences," said Daniel Vasquez, a former warden of San Quentin and Soledad state prisons in

236 members of the New York Police Department have tested positive for coronavirus and 3,200 employees are sick, triple the normal sick rate.[29]  Two federal prison staffers have also tested positive.[30]

20.     For this reason, correctional health is public health. Decreasing risk in prisons and jails decreases risk to our communities.

21.     Reducing the overall population within correctional facilities will also help medical professionals spread their clinical care services throughout the remaining population more efficiently.  With a smaller population to manage and care for, healthcare and correctional leadership will be better able to institute shelter in place and quarantine protocols for those who remain. This will serve to protect the health of both inmates as well as correctional and healthcare staff.

 I declare under penalty of perjury that the foregoing is true and correct.

Dated: San Francisco, California
        March 27, 2020

_____
Dr. Brie Williams

California. "They're in such close quarters—some double- and triple-celled—I think it's going to be impossible to stop it from spreading.").

[29] Erin Durkin, *Thousands of NYPD Officers Out Sick Amid Coronavirus Crisis*, Politico (Mar. 25, 2020), https://www.politico.com/states/new-york/albany/story/2020/03/25/thousands-of-nypd-officers-out-sick-amid-coronavirus-crisis-1268960.

[30] Elinson and Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*.

# EXHIBIT I

## ATTN: WARDEN: Request for Compassionate Release - Edward Copeland, Reg. No. 24627-037

Daniel Habib

Mon 4/6/2020 4:10 PM

To: FTD/ExecAssistant@bop.gov <FTD/ExecAssistant@bop.gov>;

Dear Warden:

I'm writing on behalf of my client, Edward Copeland, Reg. No. 24627-037, to request that BOP grant him compassionate release, pursuant to 18 USC 3582(c)(1)(A)(i) and 28 C.F.R. 571.60 et seq., and immediately release him from custody. In light of the COVID-19 pandemic and Mr. Copeland's high risk of severe illness, please accept this request on his behalf, as time is of the essence.

Extraordinary and compelling reasons exist to warrant Mr. Copeland's immediate release, namely, his advanced age (67), which places him at high risk for severe illness from COVID-19. I do not have access to Mr. Copeland's BOP medical file, and I am therefore unaware whether Mr. Copeland has other medical conditions that place him at high risk. However, you have access to his medical file, and if there are other conditions reflected therein that place him at risk (for a list, see CDC, Groups at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html), then I make my request on those grounds as well, and incorporate Mr. Copeland's medical file by reference. In any event, Mr. Copeland's age alone is enough to place him at risk. See CDC, Older Adults, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

Mr. Copeland's risk of contracting COVID-19 is further elevated by the particular circumstances of his Bureau of Prisons confinement. "Prisons are tinderboxes for infectious disease." United States v. Rodriguez, 03 Cr. 271 (AB) (E.D. Pa. Apr. 1, 2020), ECF No. 135 (granting inmate's compassionate release motion and collecting research explaining the greater risk of infectious disease spread in detention facilities); see also United States v. Marin, 15 Cr. 252 (PKC) (E.D.N.Y. March 30, 2020) (granting compassionate release to defendant based on special risks he faced from COVID-19 in BOP custody); United States v. Perez, 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020) (same). As BOP's website reflects, as of 4/6/20, FCI Fort Dix has one confirmed staff COVID-19 case. Inmates in BOP facilities, including FCI Fort Dix, face a serious risk of contracting this virus because they cannot take precautionary measures recommended by the CDC to avoid the virus, including social distancing, avoiding contact with infected persons, regular hand hygiene, and sanitizing their living spaces, among other measures.

To avoid the serious dangers COVID-19 poses to Mr. Copeland's health if he remains in detention, and based on his age and any applicable medical conditions, I request that he be granted a sentence reduction and that he be immediately released from custody (even if this includes spending a portion of his remaining custodial sentence on home confinement).

In addition, even apart from the COVID-19 pandemic, Mr. Copeland appears to be eligible for compassionate release under BOP Program Statement 5050.50 (Jan. 17, 2019). Section 4(c) of that program statement makes eligible "[i]nmates age 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced." Mr. Copeland is 67 years old. He was sentenced to 280 months. See Judgment at 2, United States v. Copeland, 03 Cr. 1120 (FB) (E.D.N.Y. Aug. 26, 2005), ECF No. 187. He has been in BOP custody since his arrest in September 2003, see PSR p.1, so he has served 198 months of straight time. As BOP projects his release date as 8/18/23, he appears to have accrued about 41 months of good time credit. Consequently, he has served more than 75% of his sentence, and I request compassionate release on this independent ground as well.

Please inform me of your decision on this request promptly. In addition, please contact me if I can provide any additional information related to this application. Thank you for your consideration of this request.

Sincerely,

Daniel Habib
Assistant Federal Defender
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8769 (o)
(212) 571-0392 (f)
he/him/his

Re: ATTN: WARDEN: Supplemental Request for Compassionate Release - Edward Copeland, Reg. No. 24627-037

FTD/Exec Assistant~ <FTD/ExecAssistant~@bop.gov>

Sat 4/11/2020 12:50 PM
Inbox
To:Daniel Habib <Daniel_Habib@fd.org>;

A response to your request was mailed on April 7, 2020.

>>> Daniel Habib <Daniel_Habib@fd.org> 4/7/2020 10:46 PM >>>
Dear Warden:

I'm writing on behalf of my client, Edward Copeland, Reg. No. 24627-037, to request that BOP grant him compassionate release, pursuant to 18 USC 3582(c)(1)(A)(i) and 28 C.F.R. 571.60 et seq., and immediately release him from custody. In light of the COVID-19 pandemic and Mr. Copeland's high risk of severe illness, please accept this request on his behalf, as time is of the essence. This request supplements the request made via email of 4/6/20 with additional information concerning Mr. Copeland's medical conditions and his release plan.

Extraordinary and compelling reasons exist to warrant Mr. Copeland's immediate release, namely, his advanced age (67), which places him at high risk for severe illness from COVID-19. I do not have access to Mr. Copeland's BOP medical file, and I am therefore unaware whether Mr. Copeland has other medical conditions that place him at high risk. However, it is my understanding that Mr. Copeland (i) is borderline diabetic; (ii) was treated for hepatitis C within the last six months; and (iii) is currently being treated for hypertension, all of which could increase his risk. See CDC, Groups at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus /2019-ncov/need-extra-precautions/groups-at-higher-risk.html; CDC, Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019: United States, February 12 – March 28, 2020, https://www.cdc.gov /mmwr/volumes/69/wr/mm6913e2.htm; Fang et al., Are Patients with Hypertension and Diabetes Mellitus at Increased Risk for COVID-19 Infection?, The Lancet (March 11, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30116-8 /fulltext.  In addition, you have access to Mr. Copeland's medical file, and if there are other conditions reflected therein that place him at risk, then I make my request on those grounds as well, and incorporate Mr. Copeland's medical file by reference. In any event, Mr. Copeland's age alone is enough to place him at risk. See CDC, Older Adults, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

Mr. Copeland's risk of contracting COVID-19 is further elevated by the particular circumstances of his Bureau of Prisons confinement. "Prisons are tinderboxes for infectious disease." United States v. Rodriguez, 03 Cr. 271 (AB) (E.D. Pa. Apr. 1, 2020), ECF No. 135 (granting inmate's compassionate release motion and collecting research explaining the greater risk of infectious disease spread in detention facilities); see also United States v. Marin, 15 Cr. 252 (PKC) (E.D.N.Y. March 30, 2020) (granting compassionate release to defendant based on special risks he faced from COVID-19 in BOP custody); United States v. Perez, 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020) (same). As BOP's website reflects, as of 4/7/20, FCI Fort Dix has one confirmed inmate COVID-19 case and one confirmed staff case. Inmates in BOP facilities, including FCI Fort Dix, face a serious risk of contracting this virus because they cannot take precautionary measures recommended by the CDC to avoid the virus, including social distancing, avoiding contact with infected persons, regular hand hygiene, and sanitizing their living spaces, among other measures.

To avoid the serious dangers COVID-19 poses to Mr. Copeland's health if he remains in detention, and based on his age and any applicable medical conditions, I request that he be granted a sentence reduction and that he be immediately released from custody (even if this includes spending a portion of his remaining custodial sentence on home confinement). If released, Mr. Copeland would reside with his wife, Linda Johnson, at ███████████████████████████. Ms. Johnson is retired. Her phone number is ██████████. This environment would be much safer than the institutional environment at FCI Fort Dix.

In addition, even apart from the COVID-19 pandemic, Mr. Copeland appears to be eligible for compassionate release under BOP Program Statement 5050.50 (Jan. 17, 2019). Section 4(c) of that program statement makes eligible "[i]nmates age 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced." Mr. Copeland is 67 years old. He was sentenced to 280 months. See Judgment at 2, United States v. Copeland, 03 Cr. 1120 (FB) (E.D.N.Y. Aug. 26, 2005), ECF No. 187. He has been in BOP custody since his arrest in September 2003, see PSR p.1, so he has served 198 months of straight time. As BOP projects his release date as 8/18/23, he appears to have accrued about 41 months of good time credit. Consequently, he has served more than 75% of his sentence, and I request compassionate release on this independent ground as well.

Please inform me of your decision on this request promptly. In addition, please contact me if I can provide any additional information related to this application. Thank you for your consideration of this request.

Sincerely,

Daniel Habib
Assistant Federal Defender
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8769 (o)
(212) 571-0392 (f)
he/him/his



U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
P.O. Box 38
Fort Dix, New Jersey 08640

April 7, 2020

Daniel Habib
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, New York 10007

Re:  Copeland, Edward
     Register No. 24627-037

Dear Mr. Habib:

This is in response to your email dated April 6, 2020, regarding
Edward Copeland, an inmate currently incarcerated at the Federal
Correctional Institution (FCI), Fort Dix, New Jersey. In your email
you request inmate Copeland be granted Compassionate Release.

In accordance with Program Statement 5050.50, <u>Compassionate
Release/Reduction in Sentence</u>, an inmate will ordinarily make a
request for a compassionate release unless he/she is incapable of
making such a request. As inmate Copeland is capable of making his
own request, your submission on his behalf will not be considered.
However, inmate Copeland's Unit Team will provide him with the
requirements and policy qualifications related to requesting a
Compassionate Release/Reduction in Sentence.

I trust this addresses your concerns.

Sincerely,

David E. Ortiz
Warden

cc:  Edward Copeland
     Register No. 24627-037