UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA         :
                                 :
    - v -                        :
                                 :            03 Cr. 1120 (FB)
**EDWARD COPELAND,**             :
      Movant-Defendant.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - -x

# REPLY MEMORANDUM IN SUPPORT OF
# EMERGENCY MOTION FOR COMPASSIONATE RELEASE
# PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

                                                Federal Defenders of New York
                                                Daniel Habib, Esq.
                                                Attorney for Movant-Defendant
                                                **Edward Copeland**
                                                52 Duane Street—10th Floor
                                                New York, NY 10007
                                                Tel.: (646) 484–1724

TO:        RICHARD P. DONOGHUE, ESQ.
             United States Attorney
             Eastern District of New York
             271 Cadman Plaza East
             Brooklyn, NY 11201
Attn:      **J. Matthew Haggans, Esq.**
             Assistant United States Attorney

Edward Copeland submits this memorandum of law in reply to the government's opposition, Dkt. No. 306 ("Opp."), and in further support of his April 26, 2020 sealed motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) ("Mot."); *see also* Dkt. No. 305.

The government disputes none of the key facts: Copeland, now 67 years old, suffers from multiple serious medical conditions, including hypertension, aortic atherosclerotic disease, chronic hepatitis C, latent tuberculosis infection, and pre-diabetes. Copeland's age and comorbidities place him at high risk of severe illness and death from COVID–19, which has infiltrated FCI Fort Dix and has now infected at least 40 inmates, and doubtless many more. In 16-plus years in BOP custody, Copeland has incurred zero disciplinary infractions, has undergone drug treatment, has participated in dozens of programs, and "has demonstrated tremendous growth as a worker and a human being." Nor does the government contest Copeland's key legal claim: his age and deteriorating health, the COVID–19 pandemic, the virus's prevalence at Fort Dix, and the completion of more than 80% of his sentence, fit squarely within three of the sets of circumstances that the Sentencing Commission and BOP deem "extraordinary and compelling." U.S.S.G. § 1B1.13 cmt. n.1(A) ("Medical Condition of the Defendant"); *id.* cmt. n.1(B) ("Age of the Defendant"); *id.* cmt. n.1(D) & Program Statement 5050.50, § 4(c) ("Other Elderly Inmates").

Instead, the government opposes Copeland's release on three grounds, none persuasive. First, the government touts BOP's general mitigation efforts. Notwithstanding those efforts, COVID–19 is ravaging BOP. Yesterday, BOP acknowledged that "of the roughly 2,700 inmates tested" nationwide, "approximately 70% have tested positive for COVID–19." BOP Twitter Post of May 1, 2020, https://bit.ly/3bZSuyX (this, and all websites herein, last visited May 2, 2020). At Fort Dix, a low-security facility where inmates move freely and social distancing is impossible, the confirmed infection rate of 13.6 per 1,000 inmates far outstrips the rates for BOP

1

and the United States as a whole. And even that elevated rate is misleading because the government does not say how many inmates the institution has tested. Second, the government says that Copeland's violent offense of conviction and criminal history weigh against release. But Copeland's advanced age, his exemplary institutional record, and his evident transformation over the past 16-plus years confirm that continued incarceration is not necessary to punish, deter, or protect the public. Third, the government raises an exhaustion defense. This Court can moot the issue by granting Copeland's motion effective May 6, at which time the statutory 30-day period will have run; in the alternative, this Court can waive exhaustion altogether.

## ARGUMENT

**I.     This Court Should Reduce Copeland's Sentence To Time Served.**

**A.     BOP's Failing Mitigation Efforts Do Not Suffice To Protect A High-Risk Inmate Such As Copeland.**

Based on BOP medical records and robust epidemiological data, Copeland has demonstrated, without a word of quarrel from the government, that his age and medical conditions place him at high risk of severe illness and death from COVID–19. Mot. 4–5, 9–13. In response, the government discusses BOP's general efforts to mitigate the virus, but fails to engage with alarming evidence that those efforts are failing, both nationally and at Fort Dix.

Start with the national numbers. When Copeland filed this motion six days ago, BOP had 730 confirmed cases among inmates, 317 among staff, and 26 inmate deaths. Mot. 5. Today, those figures are 1,842, 343, and 36. BOP, COVID–19 Cases, https://bit.ly/3clOkRX. As noted above, even these disturbing figures tell only a small part of the story. BOP has tested about 2,700 inmates (less than 2% of 152,490 nationwide, *see id.*), but has found 70% of those tested positive. Even this limited sample has experienced a sharp upward spike in the past six days:



Fort Dix displays a similar trend. Six days ago, Fort Dix had 29 confirmed cases among inmates and two among staff. Mot. 6. Today, those figures are 40 and three. BOP, COVID–19 Cases, https://bit.ly/3clOkRX. These figures tell us even less than the national numbers, because the government does not specify in its opposition how many Fort Dix inmates have been tested.

      The government's observation that "less than 1.5% of FCI Fort Dix's inmate population" has tested positive (Opp. 3) is thus doubly unconvincing. Without information about the number of tests conducted, this Court can take no comfort in this statistic, especially because widespread testing yields sky-high positive rates, including among asymptomatic inmates. *E.g.*, Barr, 70% of Inmates Tested Have COVID–19: Bureau of Prisons, ABC News (May 1, 2020) (noting BOP's acknowledgement of 70% positive rate), https://abcn.ws/3fdAdQM; Winton, Coronavirus Outbreak at Terminal Island Prison Worsens: 5 Dead, 600 Infected, Los Angeles Times (Apr. 30, 2020) (noting that Los Angeles County Department of Public Health mass testing at FCI Terminal Island found 60% positive rate, and reporting that "only 1 in 10 of those checked had

3

signs of illness"), https://lat.ms/35mKANJ. This Court cannot credit the government's argument that Fort Dix is safe just because its rate of confirmed positives is low. For another thing, a rate of incidence of 13.6 per 1,000 inmates is still startling. It is higher than BOP's overall rate, and four times the national rate:

| Location | Cases | Population | Infections/ 1,000 People | Infection Rate as Percent of Population |
|---|---|---|---|---|
| FCI Fort Dix | 40 | 2,943 | 13.59 | 1.3592% |
| BOP Population | 1,842 | 152,490 | 12.07 | 1.2079% |
| Italy | 207,428 | 62,402,659 | 3.32 | 0.3324% |
| United States | 1,091,038 | 329,591,433 | 3.31 | 0.3310% |
| China | 83,958 | 1,394,015,977 | 0.06 | 0.0060% |

The government's description of BOP's general mitigation measures (Opp. 2–3) is inapposite. At Fort Dix, a low-security facility, Copeland lives in a housing unit with about 150 other inmates. The men do not live in cells. They live in rooms of two to 12 people with unlocked doors. The men come and go freely during the day, interacting in the Unit's shared hallways and common room. Inmates travel in groups to shower and to collect meals from the mess hall, and they share telephones and computers to communicate with their families and lawyers. This setting precludes social distancing and guarantees widespread contagion. *See* Mot. 5–6.

It bears repeating that the COVID–19 pandemic only pertains to Copeland's request for release under Application Note 1(A). Copeland's age, deteriorating health, and completion of a substantial percentage of his sentence provide independent grounds for release under Note 1(B), and Note 1(D) read in conjunction with § 4(c) of Program Statement 5050.50. *See* Mot. 14–16. The government does not dispute that Copeland satisfies these provisions; indeed, the government does not even address them. Thus, even if this Court were to conclude— against the weight of clinical guidance, epidemiological evidence, and powerful and worsening data from within

4

BOP—that COVID–19 poses no risk to Copeland, this Court could still grant compassionate release pursuant to Notes 1(B) and 1(D). But that would ignore the obvious: COVID–19 endangers Copeland's life with every day that passes.

**B.      Release Would Neither Endanger The Public Nor Disserve The § 3553(a) Factors.**

Next, the government argues that Copeland's release would pose a "significant danger to the community" because he "committed a violent and dangerous crime ... a bank robbery ... after an adult lifetime of similar violent crimes, several involving firearms." Opp. 8, 9. The government focuses on who Copeland was decades ago, not who is he today. Copeland is 67, and multiple longitudinal studies (left unmentioned by the government) establish that average ex-offenders in his age bracket pose vanishingly little risk of recidivism. Mot. 17. But Copeland is not an average 67-year-old ex-offender. He is one who has undergone a true transformation. He has zero disciplinary infractions in 16-plus years in BOP, a remarkable accomplishment. Mindful that drug addiction drove his criminal conduct, Copeland underwent drug education and nonresidential drug treatment. He has participated in dozens of other programs (for no good-time credit, just to better himself and his fellow inmates). And his counselor for the last six years—who knows Copeland better than counsel, or the government, or this Court—believes that he has "demonstrated tremendous growth." Mot. Exh. A. Copeland "has earned the respect [of] the other inmates while helping them along the way." He "is a leader in his religious community." And "[e]very staff member at the institution has had a positive interaction" with him. *Id.* Copeland's institutional performance confirms that this Court had it right, at sentencing, when it predicted that Copeland would not require further incapacitation after such a lengthy term. Mot. 2–3.

Copeland agrees that "rehabilitation alone" does not warrant compassionate release. Opp. 9 (quoting 28 U.S.C. § 994(t)). He is not seeking release based on rehabilitation alone. Nothing in

§ 994(t) or § 1B1.13 cmt. n.3 precludes this Court from considering Copeland's rehabilitation; to the contrary, the text of these provisions indicates that rehabilitation, although not independently sufficient, is proper grist for the mill. *See* § 994(t) ("Rehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason."); § 1B1.13 cmt. n.3 ("[R]ehabilitation of the defendant is not, *by itself*, an extraordinary and compelling reason for purposes of this policy statement.") (emphases added). If these provisions had meant to bar consideration of rehabilitation altogether, they would not have used the italicized language. Nor could this Court weigh the danger to the public, § 1B1.13(2), or the need for the sentence to punish, deter, and incapacitate, §§ 3553(a)(2)(A)–(C), without taking into account Copeland's change.

Contrary to the government's suggestion (Opp. 8), courts have granted compassionate release to others who had committed of serious and violent crimes. *E.g.*, *United States v. Bryant*, 2020 WL 2085471 (D. Md. Apr. 30, 2020) (several armed bank robberies); *Poulios v. United States*, 2020 WL 1922775 (E.D. Va. Apr. 21, 2020) (bank robbery); *United States v. Hammond*, 2020 WL 1891980 (D.D.C. Apr. 16, 2020) (gunpoint robbery); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (armed bank robbery). *See also, e.g.*, *United States v. Curtis*, 2020 WL 1935543 (D.D.C. Apr. 22, 2020) (sex trafficking of minors); *United States v. Asaro*, 2020 WL 1899221 (E.D.N.Y. Apr. 17, 2020) (arson and murder of cooperating witness).

**C.   This Court Can Grant Release Effective May 6, Which Is 30 Days After The Warden Received Copeland's Request; In The Alternative, This Court Can Waive Exhaustion Altogether.**

Finally, the government contends that Copeland's motion "should be denied" because he "has failed to exhaust administrative remedies—a statutory prerequisite to compassionate release." Opp. 4. The parties are fighting about a few days, because this Court can grant Copeland's motion effective May 6—30 days after the Fort Dix warden received Copeland's

6

request for release—without resolving the question whether exhaustion can, or should, be waived.

Section 3582(c)(1)(A) creates two alternative paths to judicial review: *either* exhaustion, *or* "the lapse of 30 days from the receipt of" a request for compassionate release "by the warden of the defendant's facility." Elsewhere, the government has conceded that as long as 30 days have run from the warden's receipt of the request, exhaustion is unnecessary. Gov't Letter at 1, *United States v. Meli*, 17 Cr. 127 (KMW) (S.D.N.Y. May 1, 2020) ("[B]ecause 30 days have elapsed from Meli's request to the warden, this Court may consider his motion regardless of whether he has pursued an administrative appeal from the Warden's denial."), Dkt. No. 232; Gov't Letter at 2–3, *United States v. Woodson*, 18 Cr. 845 (PKC) (S.D.N.Y. Apr. 30, 2020) ("Woodson has not exhausted his administrative remedies because he has not appealed the Warden's denial of his request for compassionate release. However, pursuant to [§ 3582(c)(1)(A)], upon the lapse of 30 days from the BOP's receipt of a compassionate release request by the warden of the defendant's facility, the defendant may seek judicial review of his petition. Because 30 days have passed ..., the Motion is now ripe for adjudication."), *attached as* Exh. A.

Consequently, the question whether § 3582(c)(1)(A)'s exhaustion requirement is waivable may be academic here (but not too much so: Copeland maintains that he is at risk with every day that passes). Copeland requested release on April 6, so the statutory 30-day clock expires on May 6, four days from now, and § 3582(c)(1)(A)'s plain terms will allow this Court then to grant release. The government's mistaken suggestion that the clock runs instead from April 28—the date on which Fort Dix "associated counsel's submission and the defendant's submission," Opp. 5—finds no purchase in the statutory text. Section 3582(c)(1)(A) provides that the clock runs from the "receipt" of the request for compassionate release. The warden has acknowledged that he "receiv[ed]" counsel's request on April 6. Mot. Exh. I (Letter of April 7, 2020). Counsel's

7

request was proper under 28 C.F.R. § 571.61(b) and § 2 of Program Statement 5050.50, and the government does not even try to defend the warden's refusal to consider counsel's submission. The government offers no authority for its preferred start date, no justification for the warden's derogation of BOP's own regulation and Program Statement, and thus no reason for this Court to deviate from the statute's plain language in starting the 30-day clock.

In the alternative, this Court can waive exhaustion altogether. As the parties' briefing reflects, the Second Circuit has not addressed § 3582(c)(1)(A) exhaustion, and district courts within the Circuit have split. In this District, Judges Ross and Vitaliano have held exhaustion waivable; Chief Judge Mauskopf and Judges Chen and Korman have held to the contrary. *Compare United States v. Livingston*, 2020 WL 1905202, at *1 (E.D.N.Y. Apr. 17, 2020) (ENV) ("In the context of such extraordinary life-threatening circumstances, the crafting of judge-made exceptions to a statutory exhaustion requirement is not only appropriate, but compelled by the higher authority and God-made injunction to act, as the statute would otherwise permit, to save human life.") *and United States v. Sawicz*, 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (ARR) ("The COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension, justifies waiver here.") *with* Opp. 6 (collecting cases).

Copeland respectfully submits that Judges Ross and Vitaliano have it right. The government's main response—that courts may never waive statutory exhaustion requirements, Opp. 4, 6—is not supported by precedent. The government's principal case, *Ross v. Blake*, turned on the text and history of the particular PLRA provision at issue there, and left open the possibility that "an exhaustion provision with a different text and history ... might best be read to give judges the leeway to create exceptions or to itself incorporate standard administrative-law

8

exceptions." 136 S. Ct. 1850, 1858 n.2 (2016). Likewise, the Second Circuit has held statutory exhaustion requirements waivable. *E.g.*, *New York v. Sullivan*, 906 F.2d 910, 917–18 (2d Cir. 1990) (waiving exhaustion required by 42 U.S. § 405(g), provision of Social Security Act, in part because requiring exhaustion would cause claimants "irreparable harm" in form of "deteriorating health and, and even possibly ... death"). The government's blanket contention is unsound.

More narrowly, on the facts of this case, Fort Dix's administrative process has needlessly and repeatedly obstructed the good-faith consideration of Copeland's request, triggering the unavailability exception. *See Ross*, 136 S. Ct. at 1859. To clarify the timeline: I emailed the warden on April 6 and 7, supplying all of the information necessary to evaluate Copeland's request. I identified specific age- and health-based risk factors, cited judicial decisions and medical literature, and provided a release plan. The warden had no basis in law, and no good-faith reason, to refuse to consider my submissions. *See* § 571.61(b); Program Statement 5050.50, § 2.

I received the warden's response, by mail, on or about April 15. When I was next able to speak with Copeland, on or about April 20, I relayed the warden's response to him and advised him to submit his own request. That day, Copeland did so in the form of a "cop-out" which stated that he was seeking release in light of "medical complications ... that put me at risk due to the 'coronavirus,'" namely, "Hepatiti[s] C; Borderline Diabetes; Heart Disease Medication/Atorvastatin; High Blood Pressure Medication (Hydrochlorothiazide)." Opp. Exh. A. Copeland submitted a cop-out because that is how Fort Dix staff told inmates to request compassionate release. The institution rejected that request for procedural reasons, too: "In order for your request to be properly assessed, you must indicate which category under sections 3, 4, 5, or 6 of the Program Statement in which [sic] you wish to be considered under." Opp. Exh. B. But the basis for Copeland's request was obvious, and nothing in the applicable regulation required

9

him to cite chapter and verse. Rather, he had only to specify "[t]he extraordinary or compelling circumstances that [he] believes warrant consideration," 28 C.F.R. § 571.61(a)(1), and he did so. Again, there was no reason for the institution to reject this submission. For good measure, the institution's response misstated the law in two ways. First, it said that "an inmate may initiate a request for consideration only when there are particularly extraordinary and compelling circumstances which could not have been foreseen by the court at the time of sentencing." Opp. Exh. B. But that's wrong. *See* § 1B1.13 cmt. n.2 ("[A]n extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."). Second, the response said that Copeland had to limit his request to "one specific category" in Program Statement 5050.50. But nothing in § 3582, the implementing regulations, or the Program Statement so provides, and Copeland qualifies for release under categories 3 and 4.

On or about April 27, Copeland submitted another request, this time attaching my email submission to the warden.[1] But on April 28, the government informed me that in Fort Dix's view, Copeland had no request pending. Only the government's intervention convinced the institution to "associate" Copeland's submissions with mine—even though the warden had received my submission weeks earlier. In short, it took four tries (April 6, 7, 20, 27), this motion, and the government's involvement before Fort Dix would even agree that Copeland had *requested* release. This process has not given Copeland's compassionate-release requests the good-faith and expeditious consideration that current emergency conditions demand. The only "problem[s]" to be "cured" here (Opp. 5) were those of the institution's own making. This Court need not await

---

[1] Copeland did not receive a copy of my email submission until about he got his legal mail on or about April 27. The statement in Copeland's motion that he had "resubmitted counsel's email requests" by April 26 is therefore incorrect; I misunderstood what Copeland told me. As set forth above, Copeland submitted a cop-out on April 20, and my email submission on April 27.

10

further administrative proceedings before reaching the merits.

## CONCLUSION

This Court should grant Copeland's motion, reduce his sentence to time served, convert the unserved portion of his sentence to a term of supervised release, and modify the conditions of supervision as appropriate, including by ordering a term of home confinement.

Dated: New York, New York
May 2, 2020

Respectfully submitted,

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU

By: /s/
**DANIEL HABIB**
Attorney for Movant-Defendant
**Edward Copeland**
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (646) 484–1724

11